STATE of Missouri, Plaintiff-Respondent,

v.

Felix W. DUNCAN, Jr.,
Defendant-Appellant.

No. 36972.

Missouri Court of Appeals,
St. Louis District,
Division One.

July 6, 1976.

Motion for Rehearing or Transfer
Denied Aug. 18, 1976.

James C. Jones, Asst. Public Defender, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Charles L. Howard, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

McMILLIAN, Judge.

Defendant appeals his conviction of murder in the second degree, for which he was sentenced to twenty (20) years in the Missouri Department of Corrections. For the reasons discussed below, we affirm.

On the evening of March 15, 1974, defendant went to the Hole in the Wall Tavern with LaVera Davenport. After a few minutes, they went to 1522 Elliott Avenue, St. Louis, Missouri, where Ms. Davenport lived with Linda Jamison. Defendant asked for a shotgun, and Ms. Jamison gave him one which was in the kitchen. Ms. Davenport carried the shotgun back to the tavern for defendant. Defendant told her that he was "going to get that man" and pointed out a man wearing a brown hat, brown jacket and brown pants.

At about 12:30 A.M., Ms. Jamison and Ms. Davenport returned home. Marvin Hemphill (Ms. Davenport's boyfriend) and two other men arrived shortly thereafter.

Ms. Jamison testified that between 2:00 to 2:30 A.M., defendant asked her for a clothes hanger, straightened it out and left with Hemphill, saying that he was going to steal a car. That was the last she saw of them before falling asleep.

At this point Ms. Davenport's testimony becomes crucial. According to her, defendant said that he was going to get a car and left alone with the shotgun but without the clothes hanger. When defendant returned with a billfold, his right hand was cut and bleeding. He said, " . . . 'I'm going to kill that mother.' . . . " Then he ran back outside with the shotgun, followed by Hemphill and Ms. Davenport. She observed defendant with the shotgun by a parked car. He was aiming at the car window and fired two shots. Ms. Davenport stated unequivocally that Hemphill did not have the shotgun. Defendant and Hemphill transferred a man from the front to the back seat of the parked car and drove off.

Ms. Willie Burch, who resided in the 2700 block of Howard Street, testified that between 2:00 and 2:30 A.M., on March 16, 1974, she heard three shots. Noises, like someone running, attracted her attention, so she looked out her back bedroom window. She saw two girls in the next yard and defendant coming into her backyard. Defendant ran up a gangway near the kitchen door. There was a noise with the trash can. Then defendant left her yard, and she heard an argument from the next yard. Although Ms. Burch could not make out the entire dialogue she recognized several statements as being those of defendant's. Defendant made a statement about " . . . somebody help him to do something . . . ." Defendant was concerned with "fixing something or trying to unfix something." Ms. Burch testified, "There was something said, but I didn't tell you to shoot, I said pull it" and that defendant responded, " . . . the guy could identify him or something." Ms. Burch knew Hemphill and stated that he was not a party to the conversation. Defendant went down the ally toward Elliott Avenue, while the two girls and another boy went down Howard Street. The next Monday night, when Ms. Burch emptied her trash can, she found a shotgun in three parts.

At some time prior to 4:20 A.M., on March 16, 1974, defendant and Hemphill brought a body to City Hospital No. 2 in a 1971 Pontiac with the front two door windows completely shattered. The cause of death was a shotgun wound on the right side of the face.

Defendant and Hemphill were taken to the Ninth District Police Station to be questioned as possible witnesses to the shooting; they were not considered suspects. Under these circumstances, without being placed under arrest or advised of his constitutional rights, defendant made a statement between 7:30 A.M. and 8:30 A.M. Defendant and Hemphill were first considered as suspects when their statements were inconsistent. Then a gunshot residue test was administered. Defendant was next ques-

tioned at about 2:00 P.M. At that time, defendant was told that he was under arrest and charged with murder. He was given his rights. After each right, he indicated that he understood and waived his rights. Defendant then gave a second statement. He said that he had not told the truth in the first statement. He said that he was close to the deceased when the incident occurred but that Hemphill was the perpetrator.

A senior research chemist from the Environmental Trace Substances Research Center at the University of Missouri used neutron activation analysis (hereafter NAA) to interpret the gunshot residue tests administered to defendant and Hemphill. He testified that both defendant and Hemphill had handled and discharged a firearm.

On appeal defendant raises four points as error. First, he contends that the court erred in overruling defendant's motion for judgment of acquittal at the close of all the evidence because the state failed to establish that the victim's death was caused by defendant. Second, he contends that the trial court erred in overruling defendant's motion to suppress his second statement because it was tainted by a prior inadmissible statement. Third, he contends that the trial court erred in admitting into evidence a sawed-off shotgun, because no foundation was laid and it was irrelevant. Fourth, he contends that the trial court erred in admitting into evidence the purported shirt and pants of the victim, because these exhibits were not identified by the witnesses and no chain of custody was shown.

Defendant's first contention comes to us in a novel posture. Typically, a defendant asserts that positive results in his own gunshot residue tests are inadmissible because NAA lacks reliability. *State v. Stevens,* 467 S.W.2d 10 (Mo.1970); *State v. Johnson,* 539 S.W.2d 493 (Mo.App.1976) and *State v. Ross,* 523 S.W.2d 841 (Mo.App.1975). Here, on the contrary, defendant is asking us to hold that NAA results are not only admissible but so conclusive that positive results on both defendant and another person will negate eyewitness testimony that defendant

alone fired the gun. If the interpretation of NAA results were to overcome Ms. Davenport's testimony, the state would have proved that defendant fired a gun but would have failed to exclude the hypothesis that the victim was already mortally wounded by a shot from Hemphill. According to defendant's logic, since the state has the burden of proving all the elements of second degree murder, including proof that the defendant's act *caused* death, the state failed to make a prima facie case.

■ Defendant relies upon the so-called "physical facts" rule:

"Testimony of a witness, although not directly controverted, which is opposed to the unquestioned laws of nature that lie within the court's judicial knowledge or which is clearly in conflict with scientific principles as established by the laws of physics or mechanics is of no probative value . . . [U]pon review the appellate court may ignore the testimony or reverse the case for lack of evidence sufficient to sustain the verdict. . . ." 30 Am.Jr.2d, Evidence, § 1086. See e. g., *Gilpin v. Gerbes Supermarket, Inc.,* 446 S.W.2d 615 (Mo.banc 1969); *Kelly v. Terminal RR Ass'n of St. Louis,* 315 S.W.2d 699 (Mo.1958); *Ochs v. Wilson,* 427 S.W.2d 748 (Mo.App.1968); *Ewen v. Spence,* 405 S.W.2d 521 (Mo.App.1966). The "physical facts" rule applies only when the conflicting testimony goes to some vital issue in the case. *Vaeth v. Gegg,* 486 S.W.2d 625, 628 (Mo.1972) and *State v. Davis,* 504 S.W.2d 221, 223 (Mo.App.1973). The rule does not apply to the credibility of witnesses, which is for the jury. *Anderson v. Orscheln Bros. Truck Lines,* 393 S.W.2d 452, 460 (Mo.1965) and *State v. Davis,* supra, at 223. Nor does it apply to estimates. *Anderson v. Orscheln Bros. Truck Lines,* supra, and *Wood v. Ezell,* 342 S.W.2d 503 (Mo.App.1961).

■ The short answer to defendant's first contention is that it is essentially a claim of insufficient evidence. In reviewing the sufficiency of the evidence, an appellate court is required to consider the evidence and any reasonable inferences

from the evidence in the light most favorable to the state and to disregard all contrary evidence and inferences. *State v. Stapleton,* 518 S.W.2d 292 (Mo.banc 1975) and *State v. Burks,* 521 S.W.2d 11, 14 (Mo. App.1975). Construed in this manner, the evidence is more than sufficient to sustain appellant's conviction for murder in the second degree. The testimony of Ms. Jamison, Ms. Davenport and Ms. Burch, as well as the state's exhibits, the results of defendant's gunshot residue test, the cause of death as determined by the autopsy, and defendant's arriving at the hospital with the victim and his subsequent statements to the police constitute sufficient evidence to show that appellant fired the shotgun blast which killed Henry DeBerry. All contrary evidence and inferences such as the gunshot residue test of Marvin Hemphill, are therefore disregarded. Clearly, the state made a submissible case.

Considered on the merits, defendant's first contention would raise an issue of first impression. We have been unable to find a decision ascertaining the probative force to be accorded NAA results in relation to the "physical facts" rule. Further, we emphasize at the outset that this determination must be made on a case-by-case basis. Application of the "physical facts" rule would require positive responses to two questions: First, is NAA an incontrovertible fact? Second, does it directly contradict the eyewitness testimony?

Regarding the former, NAA is an extremely accurate, widely accepted method of determining the elemental composition of a sample. *State v. Ross,* supra. However, since the NAA results by themselves reveal only what chemical elements are present and in what concentrations, all of the cases require that the computer data be interpreted by an expert witness. See generally Annot., 50 A.L.R.3d 117 (1973) and cases cited therein. Based on the levels of barium and antimony in the sample, the expert testifies as to the likelihood of the subject's having recently handled or discharged a firearm.

This testimony, like all expert testimony, can be challenged on a number of grounds, including the qualifications of the expert, the size and representativeness of the control group, the technique of analysis and the purpose for which the evidence is offered. See *State v. Stout,* 478 S.W.2d 368 (Mo.1972); *State v. Stevens,* supra; *State v. Johnson,* supra. For example, in this case it was brought out on cross-examination that shotguns pose different problems from handguns and rifles because of the tremendous amount of "blowback" and that the control group for shotguns was small (about 25 as compared to 200–250 for handguns and rifles). The weight to be accorded such testimony is for the jury. Assuming without deciding that the expert's testimony was not impeached, NAA results could have come within the rule as "facts" established by physics.

Regarding the second question, NAA results are not sufficient to overcome eyewitness testimony unless they directly contradict that testimony. In this case, the expert witness testified, " . . . within a reasonable degree of scientific certainty this person (Hemphill) had recently handled and discharged a firearm." But he defined "recently" as ranging from immediately to several days, with an average of six to twelve hours. In this case, the "fact" that Hemphill had handled and/or discharged a gun within the previous several days does not directly contradict Ms. Davenport's testimony that defendant alone fired two shots at the victim and that Hemphill did not have a shotgun at that time. The probability that he had "recently" discharged a firearm may indicate only that he fired a weapon at some earlier time. Therefore, the "physical facts" rule could not have been invoked by this court to disregard Ms. Davenport's testimony.

Defendant's second contention is likewise unavailing. The trial court sustained defendant's motion to suppress as to his first statement because he had not been given his rights at that time. However, the motion to suppress was overruled with respect to his second statement because the court

found beyond a reasonable doubt that he was properly advised of his *Miranda* rights, he understood those rights, and he voluntarily and intelligently waived them.

Our review of the trial court's ruling on the motion to suppress is limited to a determination of whether the evidence was sufficient to sustain its findings. *State v. Collins,* 519 S.W.2d 362, 363 (Mo.App.1975) and *State v. Stubenrauch,* 503 S.W.2d 136, 138 (Mo.App.1973). An earlier statement made by a defendant without being advised of his rights does not per se invalidate a subsequent statement which was made after appropriate warnings had been given. *State v. Wright,* 515 S.W.2d 421 (Mo.banc 1974) and *Boyer v. State,* 527 S.W.2d 432, 439 (Mo.App.1975).

Defendant relies on *State v. Williams,* 486 S.W.2d 468 (Mo.1972), for his assertion that his second statement was the "fruit" of his earlier inadmissible statement. *Williams,* supra, however, is inapposite. There, the suspect was under arrest and at the police station when he made the illegally obtained admissions, which were virtually identical to the subsequent written confession. Here, the two statements were not so closely related. The defendant was neither in custody nor a suspect at the time of the first statement, and, while both versions were intended to be exculpatory, defendant's second statement was completely inconsistent with his first and certainly not induced by it. In our judgment the state met its burden of proving that the accused waived his rights prior to the second statement. The defendant presented no evidence of coercion. Whatever taint may have attached to the first statement was purged prior to the second statement. There is sufficient evidence to sustain the rulings of the trial court.

Defendant's third contention is that the admission of a sawed-off shotgun, was prejudicial error because no proper foundation was laid. It is a general rule that "weapons and objects not connected with the defendant or the crime are not admissible unless they possess some proba-

tive value. . . . ." *State v. Wynne,* 353 Mo. 276, 182 S.W.2d 294, 299 (1944). See also *State v. Davis,* 530 S.W.2d 709 (Mo. App.1975). The determination of whether a weapon is properly admitted focuses on whether there is evidence which connects it to the crime or to the accused. *State v. Wynne,* supra, 182 S.W.2d at 299 and *State v. Richetti,* 342 Mo. 1015, 119 S.W.2d 330, 339 (1938). If found near the scene of the crime, a weapon with which the crime might have been committed is admissible. *State v. Bennett,* 468 S.W.2d 23, 25 (Mo. 1971) and *State v. Richetti,* supra, 119 S.W.2d at 339. Possession of the alleged murder weapon shortly before the crime is a significant factor supporting its admission into evidence. *State v. Stancliff,* 467 S.W.2d 26, 30 (Mo.1971). The identification of a weapon need not be entirely unqualified to permit its admission into evidence; the weight to be given such evidence is for the jury. *State v. Davis,* 535 S.W.2d 259, 260 (Mo.App.1976) and *State v. Murphy,* 521 S.W.2d 22, 26 (Mo.App.1975).

Ms. Jamison identified the shotgun as the one she gave to defendant that evening. Therefore, defendant possessed the alleged murder weapon shortly before the crime. Ms. Davenport testified that appellant fired a shotgun into the victim's car. Ms. Burch testified that after hearing shots she saw appellant in her backyard and heard noises at the trash can and various statements about a shooting and that the next time she examined her trash can she found a disassembled shotgun which she gave to the police. Therefore, the shotgun was near the scene of the crime. All of the above evidence tends to connect Exhibit No. 10 to both defendant and the crime. Ms. Davenport denied that Exhibit No. 10 was the shotgun she carried for defendant. However, it was for the jury to weigh her testimony against the positive identifications by Ms. Burch and Ms. Jamison. Since the evidence was sufficient to connect the shotgun to both appellant and the crime, the trial court did not err in admitting it into evidence.

Defendant's fourth contention is that the trial court erred in admitting into evidence the pants and shirt of the victim for the reason that the exhibits were not identified by the witnesses and no chain of custody was shown. The admission of exhibits into evidence, including the clothes of a victim, has been vested in the sound discretion of the trial court. *State v. McRoberts,* 485 S.W.2d 70, 72 (Mo.1972); *State v. Evans,* 406 S.W.2d 612, 617 (Mo.1966). Identification of an exhibit is not insufficient merely because the witness uses expression such as "similar to" or "looked like." *State v. Stancliff,* supra, at 30; *State v. Johnson,* 286 S.W.2d 787, 791 (Mo. 1956) and *State v. Alderman,* 498 S.W.2d 69, 72 (Mo.App.1972). The evidence need not specifically show each step in the chain of custody so long as it provides reasonable assurance that the exhibits are undisturbed. *State v. Richards,* 467 S.W.2d 33, 35 (Mo. 1971) and *State v. Alderman,* supra, at 72.

Here the sole purpose for admitting the victim's pants and shirt was to identify the man seen by Ms. Davenport as the victim. Ms. Davenport testified that, while they were at the tavern, defendant threatened to "get" a certain man. She testified that that man was wearing a brown shirt and brown pants. She identified the shirt as the one she had seen on the man in the tavern and testified that the pants were similar to those worn by the man in the tavern. She also identified the man from a photograph taken at the morgue. Her identification was adequate for the purpose offered.

Both exhibits were removed from the victim by the doctor who performed the autopsy. Officer Reeder carried the evidence bag containing the clothes from the coroner's office to the police laboratory where it was kept. Although he did not examine the articles in that bag, he identified the evidence bag containing the pants and the shirt as the bag in which he had placed the clothing. This evidence provides reasonable assurance that these clothes are the same and in the same condition. The trial court did not abuse its discretion in admitting them into evidence.

Judgment affirmed.

WEIER, P. J., and RENDLEN, J., concur.